IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

**STATE OF TENNESSEE v. TYANESHIA TURNER & JONATHAN WEBSTER**

**Appeal from the Criminal Court for Shelby County**
**No. 97-07835    Chris Craft, Judge**

---

**No. W1999-00530-CCA-R3-CD - Decided June 21, 2000**

---

Defendant Tyaneshia Turner was convicted of aggravated child abuse through neglect and she subsequently received a sentence of twenty-one years and six months. Defendant Jonathan Webster was convicted of aggravated child abuse through neglect and assault and he subsequently received concurrent sentences of twenty-one years and six months for aggravated child abuse through neglect and eight months for assault. Defendants challenge their convictions for aggravated child abuse through neglect, raising the following issues: (1) whether the evidence was sufficient to support their convictions, (2) whether their right to a unanimous jury verdict was violated by the State's failure to elect and the jury's failure to identify specific injuries as the basis for the convictions, and (3) whether Tennessee's aggravated child abuse statutes are unconstitutionally vague. In addition, the State raises the following issue: (4) whether the trial court erred when it failed to impose a release eligibility of 100% for Webster's aggravated child abuse through neglect sentence. The judgment of the trial court is affirmed in part, reversed in part, and modified in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Reversed in Part, and Modified in Part**

WOODALL, J., delivered the opinion of the court, in which WADE, P. J. and WITT, J. joined.

A.C. Wharton, Jr., District Public Defender, Brent Walker, Assistant Public Defender, and Tony N. Brayton, Assistant Public Defender, Memphis, Tennessee, for the appellant, Tyaneshia Turner, and Jeffery S. Glatstein, Memphis, Tennessee, for the appellant, Jonathan Webster.

Paul G. Summers, Attorney General and Reporter, Kim R. Helper, Assistant Attorney General, William L. Gibbons, District Attorney General, Glen Baity, Assistant District Attorney General, and Elaine Sanders, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. BACKGROUND

Defendants Turner and Webster were both indicted for one count of aggravated child abuse through infliction of serious bodily injury and one count of aggravated child abuse through neglect that resulted in serious bodily injury.

Diane Webster testified during trial that she was living in Memphis with her brother Maverick in April of 1997. Her son, Defendant Jonathan Webster, her daughter, Erica Webster, and Erica's two children came to visit her on April 8, 1997. Webster's girlfriend, Defendant Tyaneshia Turner, and Turner's eleven month old daughter, Deja, arrived on April 10, 1997. Turner and Deja stayed with Diane Webster for approximately one week before Turner and Deja moved into a shelter with Erica Webster and her children. Although Turner continued to stay at the shelter, Deja eventually returned to Diane Webster's residence.

Diane Webster testified that she and Jonathan cared for Deja on April 23, 1997. Diane Webster did not notice any injuries on Deja, but she did observe that Deja "was kind of sick" and "had fever medicine and stuff with her." Diane Webster also observed that Deja seemed irritated and she observed a "little whining" and a "little crying." In addition, Diane Webster noticed that Deja had what appeared to be a rash on her face.

Diane Webster testified that when she and her brother left home at approximately 7:00 a.m. on April 24, 1997, Jonathan was caring for Deja. When she left, Diane Webster did not observe any bruises or bumps on Deja's body. Diane Webster did observe "a little whining" on the part of Deja. When Diane Webster saw Deja at the hospital later that day, she observed that Deja's "face was bruised . . . where she had the rash and stuff, the skin was off."

Melanie Russell testified that she was working as a social worker at the Methodist Hospital North on April 24, 1997. At 11:40 a.m., Defendant Webster brought Deja to the hospital and reported that she had been injured when she fell off a couch. Russell observed that Deja was lethargic and "limp like a doll" and was not crying like babies usually do when they are in pain.

Dr. Robert Walling testified that he examined Deja on April 24, 1997, after she was transferred to LeBonheur Hospital for "further evaluation of some burns and some other trauma that was yet unrecognized to the abdomen." Dr. Walling observed that Deja had first and second degree burns on her face that were caused by a hot liquid. Dr. Walling opined that the burns were inconsistent with a fall from a couch onto carpet. Dr. Walling also opined that the burns were between four and forty-eight hours old.

Dr. Walling testified that his examination of Deja also revealed that she was suffering from abdominal injuries. Specifically, Dr. Walling observed that Deja's abdomen "was distended, was bloating, and the baby had some discomfort." Initial x-rays revealed that there were some dilated loops of the bowel. Subsequent examination with a CAT scan indicated that Deja had sustained lacerations to her liver, spleen, and pancreas. Dr. Walling opined that the abdominal injuries were inconsistent with a fall from a couch and the injuries were inflicted and nonaccidental. The injuries

were consistent with blunt trauma to the abdomen from an instrument, a fist, or a foot. Dr. Walling opined that the abdominal injuries were between one and three hours old, but he acknowledged that he initially reported to the police that the injuries were between twenty-four and seventy-two hours old. Further, Dr. Walling opined that Deja could have died from the injuries within one week if she had not received treatment.

Dr. Walling testified that as to Deja's abdominal injuries, "when [digestive acid is] leaking into the abdominal cavity, it causes discomfort, irritation, and then as a reaction to that the abdomen begins to bloat and becomes distended, and the individual with increasing time has increasing discomfort, and they usually begin to grunt and groan." Dr. Walling opined that while it was difficult to determine when the abdominal injuries were sustained, "the individual could begin having symptoms as soon as an hour to two hours to three hours after an incident." Dr. Walling also stated that in regard to Deja's abdominal injuries, they "would be manifest in certainly less than twenty-four hours. And certainly more than likely eight hours as well."

Dr. Walling testified that x-rays were taken of Deja's chest on April 24 and May 1, 1997, and the x-rays revealed that Deja had fractured ribs. Dr. Walling opined that the rib fractures were two to three weeks old at the time of the x-rays that were taken on May 1, 1997. Dr. Walling also opined that the fractures did not occur at the same time as the abdominal injuries. In addition, Dr. Walling opined that the rib fractures were nonaccidental. Dr. Walling acknowledged that it was possible that a person could "go through life" without being aware that he or she had a fractured rib, but he suggested that it was likely that the person would experience some pain.

Sergeant Eugene Ross of the Memphis Police Department testified that Defendant Webster gave a written statement to the police on April 26, 1997. In the statement, Webster related that he had cared for Deja on approximately twenty occasions, but did not give any indication of when these twenty occasions occurred. Webster stated that he cared for Deja on April 24, 1997, from 8:45 a.m. until 3:15 p.m. Webster denied abusing or neglecting Deja, and he claimed that she injured herself on the couch or floor while he was in the kitchen.

Sergeant Ross testified that he also interviewed Defendant Turner, and Turner stated that the last time she had cared for Deja was on April 22, 1997, and Deja appeared to be fine at that time.

Toya Taylor testified for the defense that she was living in the same apartment complex as Diane Webster on April 24, 1997. At approximately 9:00 a.m., Taylor went to the door of Diane Webster's apartment and glanced in and observed that Deja was sleeping on the couch and was not making any unusual sounds. Later that day, Defendant Webster approached Taylor and stated that something was wrong with Deja. Taylor suggested that they take Deja to the hospital, and they arrived at the hospital sometime between late morning and early afternoon.

Erica Webster testified that she and Defendant Webster met Defendant Turner when they were all living in a shelter in Kenosha, Wisconsin. Erica Webster, her children, Jonathan Webster, Turner, and Deja subsequently moved out of the shelter and lived in an apartment until they decided to travel to Memphis to visit Diane Webster around April 8 or 9, 1997. Before they went to

Memphis, Deja contracted a bad cold and she was treated at the hospital and was given some medicine.

Erica Webster testified that after staying with Diane Webster for one week, she and her two children moved into a Memphis shelter with Defendant Turner and Deja. Erica Webster saw Turner shake Deja one night at the Memphis Shelter when Deja was crying. Erica Webster also testified that from the time that she and Turner moved into the shelter, Jonathan Webster never saw Deja until Diane Webster took Deja to her apartment on April 23, 1997. Erica Webster did not see any burns or injuries on Deja on April 23, 1997.

At the close of the State's proof, the trial court granted Defendant Turner's motion for judgment of acquittal as to the charge of aggravated child abuse through infliction of serious bodily injury. At the close of all the proof, the trial court instructed the jury that they should consider the charge of aggravated child abuse through neglect for both Defendants. The trial court also instructed the jury that it should consider the charge of aggravated child abuse through infliction for Defendant Webster only. In addition, the trial court instructed the jury that for the charge of aggravated child abuse through infliction, the jury must unanimously agree upon and identify a serious bodily injury.

After deliberations, the jury convicted both Defendants of aggravated child abuse through neglect. The jury also acquitted Defendant Webster of aggravated child abuse through infliction, and convicted him of the lesser included offense of assault. The specific injuries identified by the jury for the basis of the assault conviction were the burns on Deja's face.

## II. SUFFICIENCY OF THE EVIDENCE

Both Defendants contend that the evidence was insufficient to support their convictions for aggravated child abuse through neglect. Defendant Webster does not challenge the sufficiency of the evidence for his assault conviction.

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this Court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App.1995). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At the time of the incidents in this case, Tennessee Code Annotated section 39-15-401

provided, in relevant part:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (1997). In addition, Tennessee Code Annotated section 39-15-402 provided, in relevant part:

> A person commits the offense of aggravated child abuse and neglect who commits the offense of child abuse and neglect as defined in § 39-15-401 and:
>
> (1) The act of abuse or neglect results in serious bodily injury to the child; . . .

Tenn. Code Ann. § 39-15-402(a) (1997). Further,

> "Serious bodily injury" means bodily injury which involves:
>
> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement; or
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

Tenn. Code Ann. § 39-11-106(a)(34) (1997).

### A. Webster's Conviction

Defendant Webster contends that the evidence was insufficient to support his conviction for aggravated child abuse through neglect.

Dr. Walling testified that when he examined Deja, he observed that her abdomen "was distended, was bloating, and the baby had some discomfort." Dr. Walling subsequently discovered that Deja had sustained lacerations to her liver, spleen, and pancreas. Dr. Walling opined that the abdominal injuries were inflicted and nonaccidental and were consistent with blunt trauma to the abdomen from an instrument, a fist, or a foot. Dr. Walling testified that Deja could have died from the injuries if she had not received treatment.

Dr. Walling acknowledged that it was difficult to determine the precise age of the internal injuries, but he opined that the injuries were between one and three hours old. Dr. Walling testified that as to Deja's abdominal injuries, "when [digestive acid is] leaking into the abdominal cavity, it causes discomfort, irritation, and then as a reaction to that the abdomen begins to bloat and becomes distended, and the individual with increasing time has increasing discomfort, and they usually begin to grunt and groan." Dr. Walling opined that in regard to the abdominal injuries, "the individual could begin having symptoms as soon as an hour to two hours to three hours after an incident." Diane Webster testified that Jonathan Webster was in sole custody of Deja after 7:00 a.m. on April 24, 1997.

We conclude that when the evidence is viewed in the light most favorable to the State, as it must be, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that

Defendant Webster, knowingly and other than by accidental means, neglected the victim in a manner that resulted in serious bodily injury. There is no dispute that the victim was less than six years old. Further, the life-threatening abdominal injuries unquestionably qualify as serious bodily injuries. A rational jury could clearly find from the testimony of Dr. Walling that Deja sustained the abdominal injuries while she was in the sole custody of Defendant Webster. A rational jury could also find that Webster's failure to protect Deja from the abdominal injuries that were inflicted and nonaccidental and were consistent with blunt trauma to the abdomen from an instrument, a fist, or a foot was knowing neglect. In short, we conclude that the evidence was sufficient to support Webster's conviction for aggravated child abuse through neglect. Defendant Webster is not entitled to relief on this issue.

## B. Turner's Conviction

Defendant Turner contends that the evidence was insufficient to support her conviction for aggravated child abuse through neglect. We conclude that even when the evidence is viewed in the light most favorable to the State, the evidence was insufficient for a rational jury to find beyond a reasonable doubt that Turner knowingly neglected the victim in a manner that resulted in serious bodily injury.

As previously stated, Dr. Walling opined that Deja's abdominal injuries were between one and three hours old when she was examined at the hospital. This was during the time that Defendant Webster was in sole custody of the victim. Thus, a rational jury could not find beyond a reasonable doubt that Defendant Turner neglected Deja by failing to protect her from the abdominal injuries or by failing to seek medical treatment for the abdominal injuries.

The State's major argument for this issue is a contention that Defendant Turner knowingly neglected Deja by failing to seek medical attention for her broken ribs. There is absolutely no proof in the record that Defendant Turner caused the rib injuries herself or that she was present when someone else caused the rib injuries. Moreover, not a single witness testified that before Deja was left in Defendant Webster's custody, Deja was in obvious pain or was exhibiting any other sign of a rib injury. Although Dr. Walling testified that it was likely that a person would experience some pain from broken ribs, Dr. Walling did not testify that Deja's rib injuries would have resulted in any symptoms that would alert a lay person to the presence of the injuries. In addition, Diane Webster testified that when Turner left Deja with her on April 23, 1997, Deja did not exhibit any signs of illness other than a "little whining" and a "little crying." Diane Webster also testified that when she left Deja with Defendant Webster on April 24, 1997, Deja did not have any bruises or bumps on her body. While the jury was not required to accredit this testimony, the fact remains that the State failed to introduce any proof that Defendant Turner knew about the rib injuries and still failed to obtain treatment as required for a conviction under the relevant statutes.

In short, we conclude that the evidence in this case was insufficient to support Defendant Turner's conviction for aggravated child abuse through neglect. Therefore, Defendant Turner's conviction for that offense is reversed and the charge for that offense is dismissed.

### III. FAILURE TO ELECT INJURY

Both Defendants contend that their right to a unanimous jury verdict was violated because the State did not elect a specific serious bodily injury for which it was seeking convictions for aggravated child abuse through neglect and the jury did not identify a specific bodily injury upon which it based the convictions for the offense.

This Court has previously addressed this precise issue and held that in cases involving a charge of aggravated child abuse through neglect, the State is not required to elect a specific serious bodily injury for which it is seeking a conviction and the jury is not required to identify a specific bodily injury upon which a conviction is based. State v. John Adams & Rita Adams, No. 02C01-9707-CR-00246, 1998 WL 389066, at *8 (Tenn. Crim. App., Jackson, July 14, 1998), app. granted, (Tenn. Feb. 8, 1999). See also State v. Angela Renee Gates, No E1998-00131-CCA-R3-CD, 2000 WL 46005, at *4–5 (Tenn. Crim. App., Knoxville, Jan. 21, 2000) (Rule 11 application pending) (holding that election was not required because the aggravated child abuse was a continuous course of conduct rather a series of discrete acts). In John Adams & Rita Adams, this Court stated:

> Finally, the appellants argue that the trial court should have required the state to "elect" which injuries were caused by the appellants' neglect. In Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973), the Tennessee Supreme Court held that it is the duty of the trial judge to require the state, at the close of it proof-in-chief, to make an election of the particular offense it will rely on for conviction and to properly instruct the jury so that the verdict of every juror would be united on the one offense. Burlison involved various allegations of sexual misconduct. The reasons for requiring election in cases that contain evidence of numerous instances of unlawful conduct is to enable the defendant to prepare for and make his defense to the specific charge; to protect him from double jeopardy by individualization of the issue; and to insure that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another. Id. at 803.
>
> The appellants had sufficient information to prepare their defense and double jeopardy is not an issue. The appellants' primary concern is that the jury's verdict was not unanimous because the members were not required to specify which serious injury was caused by the appellants' neglect. The state argues, and the trial court found, that an election of offenses was unnecessary because the offense is one continuous period of neglect. We agree. Indeed, if the state had indicted the appellants on thirteen counts of aggravated child abuse through neglect based on the injuries in this case, the appellants would most likely be arguing that neglect was one continuous offense.

John Adams & Rita Adams, 1998 WL 389066, at *8 (emphasis added). This issue is currently pending before the Tennessee Supreme Court. Unless and until such time as the supreme court holds otherwise, we see no reason to disagree with this Court's previous holding in John Adams & Rita Adams that because aggravated child abuse through neglect is a continuing offense, there is no requirement that the State or the jury identify a specific serious bodily injury as the basis for conviction. Defendants are not entitled to relief on this issue.

# IV. VAGUENESS

Defendant Webster contends that aggravated child abuse statutes are unconstitutionally vague because they do not clearly define the terms "neglect," "injury," and "serious bodily injury."

It is well-established that a statute is void for vagueness if the conduct which it prohibits is not clearly defined. State v. Lakatos, 900 S.W.2d 699, 701 (Tenn. Crim. App. 1994) (citing Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)). To survive a constitutional challenge for vagueness, a statute "must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and the statute "must provide explicit standards to prevent arbitrary and discriminatory enforcement." Lakatos, 900 S.W.2d at 701 (citation and internal quotations omitted). However, no statute can address every possible situation and absolute precision is not required. See State v. McDonald, 534 S.W.2d 650, 651 (Tenn. 1979). Indeed, a statute is not unconstitutionally vague merely because it could have been drafted with greater precision or contains some vagueness; rather, "[a]ll the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden." State v. Butler, 880 S.W.2d 395, 397 (Tenn. Crim. App. 1994). Absent substantial effect upon the exercise of First Amendment privileges or other fundamental liberties and absent vagueness as to all its applications, a defendant's challenge to a statute is limited to the defendant's own conduct. See State v. Alcorn, 741 S.W.2d 135, 139 (Tenn. Crim. App.1987).

As previously noted, at the time of the incidents in this case, Tennessee Code Annotated section 39-15-401 provided, in relevant part:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (1997). In addition, Tennessee Code Annotated section 39-15-402 provided, in relevant part:

> A person commits the offense of aggravated child abuse and neglect who commits the offense of child abuse and neglect as defined in § 39-15-401 and:
>
> (1) The act of abuse or neglect results in serious bodily injury to the child; . . .

Tenn. Code Ann. § 39-15-402(a) (1997).

Defendant Webster initially contends that the above statutes are unconstitutionally vague because the term "neglect" is not defined anywhere in the Tennessee Code. Thus, Webster claims, "a person of ordinary intelligence does not have any idea what the statute prohibits."

In determining whether terms in a statute are unconstitutionally vague, "all sections [of the statute] are to be construed together in light of the general purpose and plan, evil to be remedied, and object to be attained . . . ." State v. Netto, 486 S.W.2d 725, 729 (Tenn. 1972). Moreover, the Constitution requires nothing more than "a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Id. at 730.

The "common understanding" of "neglect" is "to ignore or disregard" or "to fail to care for or attend to sufficiently or properly." See e.g., Webster's New World Dictionary 907 (3d coll. ed. 1988). Further, the plain language of the statute prohibits "knowingly, other than by accidental means, . . . neglect[ing] . . . a child so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(a) (1997). This Court has previously held that "[t]he neglect of 'a child so as to adversely affect its health and welfare' presents a plain and certain meaning. The warning of the prohibited conduct is, in our view, sufficiently clear." State v. Cynthia Denise Smith, No. 1153, 1990 WL 134934, at *3 (Tenn. Crim. App., Knoxville, Sept. 20, 1990). Clearly, this statute gives a person of ordinary intelligence a reasonable opportunity to know that it prohibits the knowing failure to protect a child in the person's custody from abdominal injuries that are inflicted in a nonaccidental manner with an instrument, fist, or foot.

Defendant Webster also contends that the above statutes are unconstitutionally vague because the term "injury" is not defined.

This Court has previously rejected the argument that section 39-15-401(a) is unconstitutionally vague because the term "injury" is not defined. State v. Yahia Al-Baghdadi, No. 03C01-9403-CR-00112, 1995 WL 695032, at *3 (Tenn. Crim. App., Knoxville, Nov. 27, 1993), app. denied, (Tenn. May 13, 1996). This Court specifically noted that as used in section 39-15-401(a), "any reasonable definition of the term injury necessarily includes bodily injury." Id., 1995 WL 695032, at *3. "Bodily injury" is defined as "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (1997). A person of ordinary intelligence would clearly know from this definition that the lacerations to the victim's liver, spleen, and pancreas are precisely the sort of injury that are prohibited by the statute.

Defendant Webster also contends that the above statutes are unconstitutionally vague because the definition of "serious bodily injury" does not provide an objective standard for differentiating the higher level of serious bodily injury from ordinary bodily injury.

"Serious bodily injury" is defined as "bodily injury which involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34) (1997). As applied to Defendant Webster's case, this definition is not unconstitutionally vague. Dr. Walling testified that the victim would have died within a week if she had not received treatment. Dr. Walling also testified that as to Deja's abdominal injuries, "when [digestive acid is] leaking into the abdominal cavity, it causes discomfort, irritation, and then as a reaction to that the abdomen begins to bloat and becomes distended, and the individual with increasing time has increasing discomfort, and they usually begin to grunt and groan." A person of ordinary intelligence would clearly know that the lacerations to the victim's liver, spleen, and pancreas that would have resulted in her death if left untreated constitute "serious bodily injury" as used in the relevant statutes. Defendant Webster is not entitled to relief on this issue.

## V. RELEASE ELIGIBILITY

The State contends that the trial court erred when it failed to impose a release eligibility date of 100% for Defendant Webster's sentence for aggravated child abuse through neglect.

The judgment for Webster's aggravated child abuse through neglect conviction indicates that he was sentenced as a Range I standard offender to a term of twenty-one years and six months in the Tennessee Department of Correction with a standard release eligibility of 30%. However, Tennessee law requires that a sentence for an aggravated child abuse conviction must have a release eligibility of 100%. See Tenn. Code Ann. § 40-35-501(i) (1997). Therefore, we modify Webster's sentence for aggravated child abuse through neglect to reflect a release eligibility of 100%.

## VI. CONCLUSION

For the reasons stated above, we reverse Defendant Turner's conviction for aggravated child abuse through neglect and we dismiss the charge for that offense. We also modify Defendant Webster's sentence for aggravated child abuse through neglect to reflect a release eligibility of 100%. In all other respects, the judgment of the trial court is affirmed.